DANVERS MOTOR COMPANY, INC., Bob Chambers Ford, Concord–Ford–Lincoln–Mercury, Fette Ford, Inc., and Senator Ford, Inc., Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

No. CIV.A. 00–5480(JAG).

United States District Court, D. New Jersey.

Eric Lewis Chase, Esq., Bressler, Amery & Ross, Florham Park, NJ, Barry S.

Goodman, Esq., Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP, Woodbridge, NJ, Counsel for Plaintiffs.

James S. Dobis, Esq., Dobis & Reilly, P.A., Livingston, NJ, James F. Hibey, Esq., William R. Sherman, Howrey Simon Arnold & White, Washington, D.C., Counsel for Defendant.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on Defendant Ford Motor Company's ("Ford" or "Defendant") motion to dismiss the complaint filed by Plaintiff Danvers Motor Company, Inc. ("Danvers") and several other Ford dealers (collectively, "Plaintiffs").[1] Plaintiffs' responsive motion seeks injunctive relief and expedited proceedings. For the reasons set forth below, this Court finds that Plaintiffs have failed to articulate an injury-in-fact so as to establish the standing necessary to bring this action in federal court. Accordingly, Defendant's motion to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1), is granted.

## BACKGROUND

Plaintiffs are Ford dealers from several retail markets in the northeast United States. (Compl.¶¶ 19–23.) Defendant, an automobile manufacturer, sells and distributes its vehicles through franchise dealers, such as Plaintiffs. (*Id.* ¶ 37.) Plaintiffs have each signed a substantively identical Franchise Agreement with Defendant.

(*Id.* ¶ 40.) The instant litigation arises from a recent price increase Ford imposed and a sales initiative called the "Blue Oval Certification" ("BOC"). Beginning with its 2001 models, Ford raised by 1% the prices of its vehicles for dealers. (*Id.* ¶ 1.) However, Ford did not raise the manufacturer's suggested retail price ("MSRP"). (*Id.* ¶¶ 1, 49.) In April 2000, Ford instituted the BOC as a nationwide customer service and satisfaction incentive program for all of its dealers. (*Id.* ¶ 44.)

Although the BOC program is voluntary, dealers who wish to participate must achieve certification. The certification process, created by Ford and endorsed by the National Ford Dealer Council,[2] involves a number of performance criteria, including leadership, concern resolution, sales, service, and facilities. (*Id.* ¶ 47; Ex. A.) Certification requirements for each dealer differ depending on whether they are classified as a "Select dealer," a dealer with low annual vehicle sales and/or a location in a rural area, or a "Contact dealer," a dealer with greater annual vehicle sales. (*Id.* ¶ 54.) Ford maintains the right to change the BOC standards for certification, and dealers must re-certify annually. (*Id.* ¶ 9.)

Plaintiffs, in particular, take issue with the "VOC Index" and "facilities" requirements. The "VOC Index" refers to the National Voice–of–the–Consumer Target, an index which is based on the survey responses of four equally weighted questions.[3] (*Id.* ¶ 55.) There are different

---

1. Danvers is the lead plaintiff in this proposed class-action litigation. The proposed class is comprised of several Ford dealers from Massachusetts, Maine, New York, New Jersey, and Delaware. Class certification is not an issue before this Court, at present.

2. The National Ford Dealer Council, elected by dealers nationwide, advises Ford as to matters of general interest and concern to the dealers. (Def.'s Mem. at 1, n. 1.)

3. The index is based on the response to four questions: (1) overall satisfaction with the purchase experience; (2) recommendation of the dealership as a place to purchase or lease a vehicle; (3) overall satisfaction with the service experience; and (4) recommendation of the dealership as a place to service a vehicle. (Compl.¶ 55.)

VOC index requirements for Select and Contact dealers. (*Id.* ¶¶ 57–61.) Plaintiffs allege that the program's "facilities" criteria encompass all the ordinary routine aspects of running a dealership which are normally within the responsibilities and concerns of the dealer, safe from the intrusion of Ford or its agents. (*Id.* ¶ 62.) Moreover, Plaintiffs aver that the facilities criteria-a subjective standard to be determined by J.D. Power and Associates ("J.D.Power") -is "arbitrary, subject to manipulations, and to annual unilateral change." (*Id.* ¶ 66.)

While there is no penalty provided in the description of the BOC program, Plaintiffs allege that Ford has stated publicly an intention to terminate dealers who fail to obtain certification. (*Id.* ¶ 8.) Ford dealers who do satisfy the criteria and achieve Blue Oval certification will receive a number of benefits. For example, BOC dealers receive retroactive cash bonuses of between 1 and 1.25 % of the MSRP, while dealers without certification receive no cash bonuses. (*Id.* ¶¶ 50–51.) Plaintiffs describe this cash bonus system as "three-tier pricing."[4] (*Id.* ¶ 5.) Plaintiffs declare, upon information and belief, that Ford's principal motivation in instituting the BOC, is to cause, directly or indirectly, the failure and/or termination of a significant minority of its dealers. (*Id.* ¶ 3.)

In the complaint, Plaintiffs cite to an April 24, 2000 article from Automotivenews.com, entitled "Ford to Pay Top Dealers Only/Blue Oval Stores Get Invoice Refunds," which indicates that as many as 30% of Ford dealers may not initially qualify for Blue Oval Certification. (*Id.* ¶ 71.) Similarly, Plaintiffs allege that Ford was aware of the likelihood that several dealers would not qualify under the BOC Program. Plaintiffs refer to an August 28, 2000 article in Automotive News, entitled *Ford Blue Oval Bonus Stays*, in which Jim O'Conner ("O'Conner"), the President of Ford Division, declared, "If the dealer can't make certification in two years, I am not sure we want that dealer." (*Id.* ¶ 72.)

As a result, Plaintiffs maintain that dealers who do not or cannot conform to the standards necessary for Blue Oval Certification will suffer three harms: (1) the severe financial penalty in the higher cost of their vehicle orders; (2) the unavailability of certain ancillary benefits and promotional allowances made available to Ford dealers who maintain BOC; and (3) and the incalculable loss of reputation and good will as non-Blue Oval certified Ford dealers. (*Id.* ¶ 5.) Plaintiffs further allege that even the attempt of many dealers to conform to the BOC Program will exact a financial burden that may jeopardize the viability of their dealerships, and predict that the financial requirements of the BOC Program will result in the termination of a significant minority of dealers. (*Id.* ¶¶ 7, 53.)

Based on these perceived injuries, Plaintiffs filed a complaint with this Court on November 8, 2000, alleging nine counts: (1) violation of § 13(d) of the Robinson–Patman Act; (2) violation of § 13(e) of the Robinson–Patman Act; (3) in the alterna-

---

**4.** In fact, Plaintiffs imply -but do not specifically allege in their Complaint-that the price increase is a pretext, allowing Ford to use the BOC cash rebates as a means to institute discriminatory pricing between, and among, Ford dealers. At oral argument, Plaintiffs' counsel offered Plaintiffs' theory on the relationship between the vehicle price increase and the BOC program: "[The BOC dealer rebate] is a false benefit created by the...now simultaneous increase of the manufacturer's suggested retail price. This was all done at the same time by Ford saying, 'here we are, we're going to raise your inventory price for your vehicles, it's going to cost you more for a vehicle, but for those of you who are certified, we'll give you your money back.' " (Tr. at 17.) ("Tr." refers to the transcript of oral argument on August 22, 2001.)

tive, violation of § 13(a) of the Robinson–Patman Act; (4) violation of the Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221–1225; (5) and (6) violation of the state franchise protection statutes; (7) breach of the Sales and Service Agreement; (8) breach of contract (wrongful attempt to unilaterally amend the Sales and Service Agreement); and (9) breach of the implied covenant of good faith and fair dealing. (Compl.¶¶ 82–168.) On April 6, 2001, Plaintiffs filed an application for injunctive relief to be advanced and consolidated at trial, and for the Court's entry of a scheduling order setting forth the time frame for expedited discovery, consideration for class certification, and a trial date, pursuant to FED. R. CIV. P. 65(a)(2). That same day, Defendant Ford filed a motion to dismiss the complaint in its entirety for lack of subject matter jurisdiction, pursuant to FED. R. CIV. P. 12(b)(1) and for failure to state a claim, pursuant to FED. R. CIV. P. 12(b)(6).

## ANALYSIS

### A. Standard of Review on a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1)

According to the Third Circuit, a motion to dismiss under 12(b)(1) for lack of subject matter jurisdiction, "may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." *Gould Electronics, Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000) (citing *Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). The *Gould* court instructed that "[i]n reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." [5] *Gould,* 220 F.3d at 176 (citations omitted). A facial attack must not be confused with a factual challenge contending that the court in fact lacks subject matter jurisdiction, no matter what the complaint alleges, as factual challenges are subject to different standards. In reviewing a factual challenge, "a court may consider evidence outside the pleadings," and no presumptive truthfulness attaches to plaintiffs' allegations. *Gould,* 220 F.3d at 176 (citing *Gotha v. United States,* 115 F.3d 176, 178–79 (3d Cir.1997)); *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977).

Therefore, a threshold issue for this Court is whether Ford intended to mount a facial or factual attack upon this Court's subject matter jurisdiction. At the August 22, 2001 oral argument on this motion, Defendant argued that its challenge to Plaintiffs' standing was limited to the "four corners of their complaint." (Tr. at 12.) In addition, in its moving papers, Defendant focused its standing argument on Plaintiffs' allegations as stated in the complaint. (Def.'s Mot. to Dismiss at 5–7.) Accordingly, this Court will address Ford's challenges to Plaintiffs' standing as a facial attack on the complaint, and will limit its review to the complaint and those documents referenced therein.[6]

---

**5.** In this way, the standards for evaluating a Rule 12(b)(1) facial attack are similar to those governing a Rule 12(b)(6) motion. *Gould,* 220 F.3d at 176, n. 6 (citing *PBGC v. White,* 998 F.2d 1192, 1196 (3d Cir.1993)). It should be noted, however, that the standards governing the two motions are not identical. For instance, "[w]hen subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion. On the other hand, under Rule 12(b)(6) the defendant has the burden of showing no claim has been stated." *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991) (citations omitted).

**6.** Consequently, this Court will not consider any of the parties' submitted affidavits, such as the Affidavit of Edward J. Tichenor, which was discussed at oral argument. (Tr. at 4–6.) *See Gould,* 220 F.3d at 176.

## B. Preliminary Requirements for Federal Subject Matter Jurisdiction

■ The existence of a "case and controversy" is a prerequisite to all federal causes of action. U.S. Const. Art. III § 2; *Philadelphia Federation of Teachers, Am. Federation of Teachers, Local 3, AFL–CIO v. Ridge*, 150 F.3d 319, 322 (3d Cir.1998). Indeed, the Supreme Court has observed that "[c]oncerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so." *Renne v. Geary*, 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (internal quotations and citations omitted). Typically, district courts should presume that they lack jurisdiction unless the contrary appears affirmatively on the record. *Id.*

■ Included in Article III case-or-controversy requirements are standing and ripeness. *Joint Stock Society v. UDV North America, Inc.*, 266 F.3d 164, 174 (3d Cir.2001). The two doctrines sometimes overlap: "whereas ripeness is concerned with *when* an action may be brought, standing focuses on *who* may bring a ripe action." *Id.* Moreover, "in measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing." *Id.* Nonetheless, as Defendants only attack Plaintiffs' standing to sue in federal court, this Court will focus its analysis on standing.[7]

### 1. Standing

■ The elements of constitutional standing are well established:

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotations omitted).

On a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* at 561, 112 S.Ct. 2130. At issue before this Court is the first element of constitutional standing. Indeed, our standing analysis is extremely narrow: have Plaintiffs sufficiently pled an "injury-in-fact" so as to establish constitutional standing on the face of the complaint?

■ To satisfy the "injury-in-fact" requirement, "the party seeking review must be himself among the injured." *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130. The injury required to invoke Article III standing can be threatened rather than actual. *Warth v. Seldin*, 422 U.S. 490, 499, 95

7. The doctrine of standing incorporates both a constitutional and prudential element. *Joint Stock Society v. UDV North America, Inc.*, 266 F.3d 164, 174–175 (3d Cir.2001). In their reply brief, Plaintiffs assert that they have met the requirements for antitrust standing under Section 4 and Section 16 of the Clayton Act. (Pls.' Br. at 16–17.) However, before examining the issue of prudential standing and statutory interpretation, this Court must address whether Plaintiffs have met the threshold requirements of constitutional standing. *Joint Stock Society*, 266 F.3d at 175. As a result, this Court will not address Plaintiffs' arguments that they have met antitrust standing requirements.

S.Ct. 2197, 45 L.Ed.2d 343 (1975); *See also Employers Assoc. of New Jersey v. State of New Jersey,* 601 F.Supp. 232, 238 (D.N.J.1985) ("[t]hreatened injury is sufficient for standing...for preventive relief without compelling litigants to await the consummation of threatened injury") (quoting *Pacific Gas & Electric v. State Energy Resources Conservation and Development Comm.,* 461 U.S. 190, 200, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)). Such "injury may be founded on a likely and credible chain of events." *Prestage Farms, Inc. v. Bd. of Supervisors of Noxubee County, Mississippi,* 205 F.3d 265, 268 (5th Cir.2000). Nonetheless, standing has been consistently denied by federal courts "when claimed anticipatory injury has not been shown to be more than uncertain potentiality." *Id.* at 268. Moreover, in evaluating whether the plaintiff has alleged facts necessary to demonstrate concrete and imminent injury, courts are "mindful of what is *not* in the record." *Schurr v. Resorts International Hotel, Inc.,* 196 F.3d 486, 495 (3d Cir.1999). Thus, this Court must determine whether the contingencies on which Plaintiffs' injury hinges are so tenuous as to deprive Plaintiffs of standing to sue in federal court. *Sea Shore Corp. v. Sullivan,* 158 F.3d 51, 56 (1st Cir.1998).

### 2. Evidence of Injury–in–Fact

▬ Plaintiffs bear the responsibility to "allege facts demonstrating that [they are the] proper [parties] to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Renne v. Geary,* 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991); *Mortensen v. First Fed. Savings and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). Accordingly, this Court will first examine Plaintiffs' alle-

gations, as enumerated in the complaint. In support of an injury, Plaintiffs first point to their allegation that Ford spokespersons, including the president of Ford himself, have represented an intent to terminate dealers who do not make BOC certification (Compl.¶¶ 46, 72); as a result, they argue that imminent injury is clearly demonstrated on the face of the complaint, and not conjecture based solely on "information and belief." (Tr. at 6.)

Moreover, although Plaintiffs admit that four of the five named Plaintiffs have now obtained Blue Oval Certification[8] (Tr. at 29), Plaintiffs suggest that the status of the dealers' certification is not relevant. (*Id.* at 30.) Rather, Plaintiffs maintain that their standing is sufficiently articulated by their allegation that they have suffered injury-in-fact by the diversion of dealers' funds, personnel, equipment, and time to the application for Blue Oval Certification, as well as from the severe financial losses attributable to the inequities of the Program. (Compl. ¶¶ 53, 74–77; Pls.' Br. at 17.) Plaintiffs further assert that because Blue Oval Certification must be renewed annually, the potential loss of BOC status, and the efforts required to renew, remain a "continual, constant threat." (Tr. at 8, 16; Compl. ¶¶ 9, 74.)

On the other hand, Ford stresses that not only have most of the named Plaintiffs been certified as of August, 2001 (Tr. at 12), but also that "there is no allegation in the complaint that any of these plaintiffs have either been terminated or threatened [with] termination." (*Id.*) Furthermore, Ford argues that there is no allegation in the complaint that any of the named Plaintiffs had applied for Blue Oval Certification and been denied. (*Id.*) In response to Plaintiffs' argument that the annual re-

---

**8.** At oral argument, Plaintiffs described the BOC status of Bob Chambers, the only remaining named plaintiff who was not then certified, as "not certified, or not certified yet." (Tr. at 29.) This Court has no evidence that Chambers' status has since changed.

newal process—and Ford's discretion to change the requirements for renewal at any time—constitutes imminent harm, Ford reasoned:

> Is there a recertification process? Absolutely there is. And I don't know how it's going to apply to these five or any of the other dealers going down the road. You can't speculate with respect to injury and expect to find standing in the federal court. (Tr. at 13.)

Similarly, Ford challenges Plaintiffs' allusion to the threat of termination by the president of Ford, arguing that the quote cited in the Complaint was taken out of context and fails to articulate an imminent threat particular to Plaintiffs.[9] (*Id.* at 14.)

### 3. Analysis

This Court agrees with the Defendant. In the verified complaint, Plaintiffs do not allege that they have suffered a concrete and particularized injury-in-fact such that they have constitutional standing to litigate before this Court. For example, Plaintiffs assert that a substantial minority of Ford dealers will be unable to meet the requirements of BOC. (Compl.¶ 6.) However, Plaintiffs have admitted that as of August 22, 2001, all except for Bob Chambers Ford had been certified.[10] (Tr. at 29.) Thus, at least as to four of the named Plaintiffs, any alleged threat of injury relating to the effects of non-certification is no longer concrete or particularized. In fact, most of the injuries articulated by Plaintiffs concern the disadvantages of failing certification. (Compl.¶¶ 5, 8, 71–72.) As a result, Plaintiffs urge this Court to

infer that the mere attempt to achieve certification-both initially and each year thereafter-carries with it a cost that is, or should be, construed as an injury. (*Id.* ¶ 7.)

This contention appears to be speculative at this juncture. To the extent that Plaintiffs' allegations of injury rely upon Ford's discretion to change the requirements for Blue Oval certification, Plaintiffs do not allege that any future change to the program's requirements would likely make the certification process more onerous, or in some other manner cause injury to Plaintiffs. Such an inference would be clearly hypothetical. More important, there is an absence of an averment from which this Court could reasonably draw such an inference. Unfortunately, the complaint is littered with similar conjecture. Plaintiffs have not articulated that they themselves have suffered any concrete harm, or that any harm is imminent as a result of the BOC program-whether that harm arises from the mere attempt to certify or from a future denial of certification. In fact, Plaintiffs' allegations support the opposite conclusion.

For example, Plaintiffs aver that in order to satisfy the "facilities" criteria, "the dealer's investment *could* have to increase sizeably." (Compl.¶ 64) (emphasis added). Additionally, Plaintiffs' allege that the process performed by J.D. Power, as part of Blue Oval certification, is "*subject to* manipulations [ ] and to annual unilateral change." (*Id.* ¶ 66) (emphasis added). Plaintiffs further allege that the attempts

---

**9.** The Automotive News article, attached as an exhibit to the complaint, provides a broader context for the quote: "We are saying to the dealer, 'You have two years. We will give you all the money back retroactively.' If the dealer can't make certification in two years, I am not sure we want that dealer," O'Conner said. "The targets are reasonable and attainable. If a person can't get his organization

geared up in two years, I'd say that they are not doing a very good job of handling customer satisfaction." (Compl.Ex. D.)

**10.** To the extent that the complaint purports to represent the interests of other similarly situated dealers, the conclusion that they would necessarily be adversely affected by the BOC program is likewise speculative.

to conform to the BOC program "will exact a financial burden that *may* jeopardize the viability of their dealerships." (*Id.* ¶ 7) (emphasis added). Finally, Plaintiffs declare that the "hurdles of the Blue Oval Program will *predictably* bring about over time the termination of a significant minority of dealers." (*Id.*) (emphasis added). Thus, even accepting Plaintiffs' allegations as true, Plaintiffs have simply stated that implementation of the BOC program *might* cause a concrete and particularized injury.

Plaintiffs' allegation that Ford has instituted different initial requirements for "Select Dealers" and "Contact Dealers," is similarly deficient. (Compl.¶ 54.) It is unclear how this distinction represents an injury to Plaintiffs. Plaintiffs do not, for instance, state whether the named Plaintiffs are Select or Contact Dealers; nor do they allege how the distinction will result in an adverse effect on any of the named Plaintiffs, or on either category of dealer generally. The averment of this distinction, without more, cannot suffice to allege an injury-in-fact. *See e.g., Pennsylvania Protection and Advocacy, Inc. v. Houston,* 136 F.Supp.2d 353, 359 (E.D.Pa.2001) (The "presumption of truthfulness [afforded to the complaint in 12(b)(1) facial challenges] does not force courts to credit bald assertions, unsupported conclusions, unwarranted inferences, or legal conclusions masquerading as factual conclusions.")

Plaintiffs' claim that they are injured by the ongoing threat of termination, namely, of facing "the likelihood that Ford will continue unilaterally to increase the pricing and the requirements to dealers at will," (*Id.* ¶ 75) is simply too speculative, and remote to support a finding of constitutional standing. Consequently, this Court finds that Plaintiffs have failed to allege an injury-in-fact to establish standing to sue before this Court.

Moreover, because Plaintiffs have failed to demonstrate standing on the face of their complaint, this Court need not address Defendant's claims that Plaintiffs have failed to state a claim, pursuant to Rule 12(b)(6). *See ACLU–N.J. v. Township of Wall,* 246 F.3d 258, 261 (3d Cir. 2001) ("If plaintiffs do not possess Article III standing, both the District Court and the Court of Appeals lack subject matter jurisdiction to address the merits of plaintiffs' case.")

### CONCLUSION

Based on the above reasoning, this Court GRANTS Defendant's motion to dismiss for lack of standing, and the complaint is dismissed without prejudice.