

Villanova University School of Law

**2005 Decisions**

Opinions of the United
States Court of Appeals
for the Third Circuit

12-19-2005

# Danvers Mtr Co Inc v. Ford Mtr Co

Precedential or Non-Precedential: Precedential

Docket No. 04-3950

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Danvers Mtr Co Inc v. Ford Mtr Co" (2005). *2005 Decisions.* Paper 16.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/16

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-3950

DANVERS MOTOR CO., INC., a Massachusetts
corporation;
BOB CHAMBERS FORD, d/b/a Augusta Ford, a Maine
corporation;
CONCORD FORD-LINCOLN-MERCURY, a New York
corporation;
FETTE FORD INC., a New Jersey corporation; SENATOR
FORD, INC.,
a Delaware corporation; ROSEVILLE MIDWAY FORD
COMPANY, a Minnesota
corporation; FULLERS' WHITE MOUNTAIN MOTORS, an
Arizona corporation;
CONDON FORD, INC., an Iowa corporation; G. & S.
MANAGEMENT
CORPORATION, d/b/a Tilton Ford, a New Hampshire
corporation,
on behalf of themselves and all others similarly situated,

Appellants

v.

FORD MOTOR COMPANY

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE DISTRICT OF NEW JERSEY

(Dist. Ct. No. 02-CV-02197)
District Court Judge: Hon. John W. Bissell, Chief Judge

Argued: July 15, 2005

Before: ALITO, VAN ANTWERPEN, and ALDISERT, <u>Circuit Judges</u>

(Filed: December 19, 2005 )

*Counsel for Appellant*

Eric L. Chase (argued)
Genevieve K. LaRobardier
Bressler, Amery & Ross, P.C.
325 Columbia Turnpike
Florham Park, NJ 07932

Barry S. Goodman
Greenbaum, Rowe, Smith
 & Davis, LLP
Metro Corporate Campus One
Woodbridge, NJ 07095

*Counsel for Appellees*

James F. Hibey (argued)
William R. Sherman
Coke Morgan Stewart
 Howrey Simon Arnold & White, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004

OPINION OF THE COURT

ALITO, <u>Circuit Judge</u>:

Eight automobile dealers appeal the District Court's

dismissal of their claims against the Ford Motor Company for lack of standing. Because their complaint alleges concrete and particularized injuries that are fairly traceable to Ford's behavior and redressable in court, we reverse and remand.

I.

In November 2000, a putative nationwide class of Ford dealers brought suit, claiming that Ford's recently introduced Blue Oval Program ("BOP") violated state and federal law. A District Court dismissed the case without prejudice for lack of standing. Danvers Motor Co. v. Ford Motor Co., 186 F. Supp. 2d 530 (D.N.J. 2002) ("Danvers I").

Instead of appealing Danvers I, the Plaintiffs revised their complaint and filed it anew on May 6, 2002. Ford responded with a motion to dismiss, which prompted Plaintiffs' latest effort, an "amended and supplemented" complaint filed on January 7, 2003. In an unpublished opinion we will call Danvers II, the District Court held that eight of the nine named Plaintiffs "do not yet have an injury that will support constitutional standing." Joint Appendix ("App.") at 24. The ninth Plaintiff is not a party to this appeal.

A.

"When reviewing an order of dismissal for lack of standing, we accept as true all material allegations of the complaint and construe them in favor of the plaintiff." Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 224 (3d Cir. 1998). We therefore relate the facts as alleged in the Plaintiffs' complaint.

Plaintiffs sell Ford automobiles in accordance with "the terms of a standard Ford Franchise Agreement." Complaint ¶¶ 33–36. They claim that Ford's BOP "is part of a coordinated objective to control and micromanage all Ford dealerships." Id. ¶ 42. Ford describes its BOP, introduced in April 2000, as a nationwide customer service and satisfaction incentive program designed to improve dealer performance. It is technically voluntary, but every Ford dealer is forced to bear the costs of the

3

program, while only those who are "BOP certified" may reap its benefits. All eight dealers on appeal have been certified.[1]

In order to finance its BOP, Ford charges an additional 1% for its automobiles, leaving the Manufacturer's Suggested Retail Price unchanged. When dealers sell the vehicles, Ford essentially reimburses them by giving them a "bonus" of 1.25% if the dealers met the initial certification requirements by April 17, 2001. The bonus drops to 1% if the dealer applied on or after April 1, 2001, and achieved certification prior to April 1, 2002. Ford originally planned to drop the bonus to .75% in April 2004, and to .5% in 2005, but it has since abandoned this plan. See App. at 77.

Certification entitles dealers to a number of benefits beyond these reimbursements. According to the complaint, dealers also receive 10% transportation assistance allowance bonuses; 50% discounts on all retail invoice messages; 401K plans for dealers' employees; access to the Blue Oval Certified Healthcare Plan; and Blue Oval National Advertising. See id. at 78.

Plaintiffs allege that the certification process is onerous, requiring significant expenditures of time and money, and resulting in a substantial loss of control over dealership activities. Certification requires dealers to meet standards under a number of performance criteria, including leadership, concern resolution, sales, service, facilities, and customer service. See id. at 75. As explained at length in the complaint, the criteria are detailed, comprehensive, and difficult to meet.

A necessary condition for BOP certification is the so-called National Voice of the Consumer Target, a creation of JD Power & Associates. To become certified, most dealers must receive sufficiently high survey scores from customers on four survey questions. See Danvers I, 186 F. Supp. 2d at 532–33; App. at 79–81. If their scores are high enough, all other certification

---

[1]Condon Ford was certified on December 10, 2000, but subsequently lost Blue Oval Certification on March 11, 2002. Id. ¶ 137.

4

requirements are waived. Plaintiffs aver that "the only way a dealer's score can increase" is if a customer marks "completely satisfied" in response to every question. Complaint ¶ 72 (emphasis in original).

Another criterion for BOP certification is a set of facilities requirements, which allegedly "encompass all the ordinary routine aspects of running a dealership which are normally within the responsibilities and concerns of the dealer, safe from the intrusion of Ford or its agents." Danvers I, 186 F. Supp. 2d at 533. See also App. at 84–85. "Under the current standard, [in densely populated areas,] J.D. Power must deem the dealers's facility equal to or better than two of four full-line dealerships within a ten-mile radius." Complaint ¶ 90.

BOP certification does not end a dealer's obligations. According to the complaint, the Program requires annual re-certification, which may involve "unilaterally altered standards." See App. at 81. For example, from 2001 to 2002, Ford increased the Voice of the Customer survey scores necessary to remain certified, and demanded "[o]ne-day service appointment availability, down from two business days." Complaint ¶ 73. "A dealer had to satisfy Ford's requirements each and every year or Ford will decertify the Certified dealers, withhold the reimbursements, and withdraw most benefits." Id. ¶ 74. In 2002, due to increased certification targets, 100 dealers "fell off the Program," and as of November 14, 2002, about 65 remained uncertified. Id. ¶ 77.

The complaint states that the BOP certification and re-certification processes constitute nine violations of federal and state law.[2] More generally, it claims that "Ford's intent, through the Blue Oval Program . . . is, has been and will continue to be, to

---

[2]Plaintiffs assert claims under the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (d) & (e), the Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221–25, and various state franchise statutes, as well as breach of contract, and breach of the implied covenant of good faith and fair dealing. See App. at 15–16; id. at 108–33.

constructively terminate virtually at will the number of dealers it chooses and to increase control of the operations of the remainder." Id. ¶ 101. It seeks declaratory relief, an injunction against the BOP "in its entirety," damages, and attorneys' fees.

B.

Plaintiffs allege that the BOP caused them at least four types of injuries. They say it caused them: 1) to spend money against their will to comply with its certification requirements; 2) to relinquish control over certain aspects of dealership operations; 3) to forfeit interest payments which would be otherwise earned on money spent covering the BOP's mandatory 1% fee; and 4) to face the constant threat of losing certification if Ford chooses to ratchet up BOP standards in the future.

Ford responded to Plaintiffs' complaint with a motion to dismiss for lack of subject matter jurisdiction and a motion to dismiss for failure to state a claim. See Fed. R. Civ. P. 12(b)(1), (6). Limiting its discussion almost exclusively to the fourth species of alleged harm, the District Court granted the 12(b)(1) motion, holding that the Plaintiffs lacked standing. It reasoned that the ongoing threat of termination "is simply too speculative and remote to support a finding of constitutional standing." App. at 24. The Court detected no "affirmative intent by Ford to terminate any dealer who does not achieve Blue Oval Certification." Id. "Although it seems clear that many of the dealers who are currently certified will 'fall off the program' by 2006," the Court concluded that "these dealers do not yet have an injury that will support constitutional standing." Id.

Only one sentence in the District Court opinion arguably touches on the Plaintiffs' allegations of past and present harms. This sentence states: "[Plaintiffs'] allegations pertaining to the cost of maintaining their certification in order to avoid potential termination are just not enough to establish a concrete and imminent, rather than conjectural, harm." Id. (citing Complaint ¶¶ 102–32, 162–206, 219–42) (emphasis in original).

The Danvers II opinion relied heavily on the reasoning of

6

Danvers I as further justification for its holding. In Danvers I, the Plaintiffs claimed that they "suffered injury-in-fact by the diversion of dealers' funds, personnel, equipment, and time to the application for Blue Oval Certification, as well as from the severe financial losses attributable to the inequities of the Program." 186 F. Supp. 2d at 536. Nevertheless, the Court held that the Plaintiffs "have not articulated that they themselves have suffered any concrete harm" arising "from the mere attempt to certify." Id. at 537.

> For example, Plaintiffs aver that in order to satisfy the "facilities" criteria, "the dealer's investment could have to increase sizeably." Additionally, Plaintiffs' allege that the process performed by J.D. Power, as part of Blue Oval certification, is "subject to manipulations [ ] and to annual unilateral change." Plaintiffs further allege that the attempts to conform to the BOC program "will exact a financial burden that may jeopardize the viability of their dealerships." Finally, Plaintiffs declare that the "hurdles of the Blue Oval Program will predictably bring about over time the termination of a significant minority of dealers." Thus, even accepting Plaintiffs' allegations as true, Plaintiffs have simply stated that implementation of the BOC program might cause a concrete and particularized injury.

Id. at 537–38 (emphasis added in original) (citations omitted). Based on this passage, it can be inferred that the District Court in this case found no standing for two reasons: the threats of future harm were not imminent, and the allegations of present and past harm were not sufficiently "concrete," because the statements in the complaint were not sufficiently direct and unqualified.

II.

Constitutional standing requires (1) injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992); Khodara Environmental, Inc. v. Blakey, 376 F.3d 187, 193 (3d Cir. 2004) (collecting cases). "Plaintiffs bear the burden of proving standing." Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir. 2003).

A "legally and judicially cognizable" injury-in-fact must be "distinct and palpable," not "abstract or conjectural or hypothetical." Raines v. Byrd, 521 U.S. 811, 819 (1997); Allen v. Wright, 468 U.S. 737, 751 (1984) (internal quotations omitted) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975), and Los Angeles v. Lyons, 461 U.S. 95, 101–02 (1983)). While it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms. In Havens Realty Corp. v. Coleman, for example, an organization devoted to fair housing practices suffered a "concrete and demonstrable injury" when a realty company's racial "steering" practices "perceptibly impaired [its] ability to provide counseling and referral services for low-and moderate-income homeseekers," resulting in a "drain on the organization's resources." 455 U.S. 363, 379 (1982); see also San Diego County Gun Rights Comm. v. Reno, 98 F.3d 1121, 1130 (9th Cir. 1996) ("Economic injury is clearly a sufficient basis for standing."); Wright and Miller, Federal Practice and Procedure, § 3531.4 at 830 (2005 Supp.) ("Standing is found readily, particularly when injury to some traditional form of property is asserted.").

Wright & Miller illustrate the concept of injury-in-fact with a simple example. "If customs officials were to institute a new and rigorous policy for inspecting packages brought in from other countries, . . . [s]tanding probably would be recognized for a business firm that asserted a commercial injury arising from increased delay or expense." Wright & Miller, § 3531.4 at 830; see also id. at 847 n.7 ("Standing always should exist to claim damages, unless perhaps the theory of damages is totally fanciful."); Wright v. Riveland, 219 F.3d 905, 914 (9th Cir. 2000) (prison inmates had standing to challenge a statute deducting 35% of all funds received by an inmate from outside sources).

The injury-in-fact requirement exists to assure that litigants

8

have a "personal stake" in the litigation. See The Pitt News v. Fisher, 215 F.3d 354, 360 (3d Cir. 2000). By ensuring that litigants present actual cases and controversies, it is also keeps the judicial branch from encroaching on legislative prerogatives, thereby preserving the separation of powers. See Valley Forge v. Americans United for Separation of Church and State, 454 U.S. 464, 473–74 (1982).

III.

The sole issue before us is whether the Plaintiffs have standing to sue Ford for injuries suffered due to the Blue Oval Program. Our review of a District Court's denial of Article III standing is plenary. See Hutchins v. IRS, 67 F.3d 40, 42 (3d Cir. 1995). To be clear, Plaintiffs allege that the BOP itself is illegal. See Complaint ¶¶ 2–3 (describing the BOP as an "illegal" program which was "imposed" upon the dealers); id. ¶ 47 (explaining that although the Program is "purportedly 'voluntary,'" it requires a "compelled payment" by "all Ford dealers"); id. ¶ 95 (calling the BOP requirements "coercive"). To state an injury-in-fact sufficient to survive a motion to dismiss, they must simply plead that they suffered some concrete form of harm because of the BOP. See Lujan, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (internal quotations, brackets, and citation omitted).

The complaint is replete with assertions of cognizable harm. For example, page 2 of the Complaint contains a separate section called "Standing," which begins: "Plaintiffs are Ford dealers who have suffered economic injury-in-fact as a result of . . . the invasion by Defendant Ford Motor Company ("Ford") of its dealers' legally protected interests, concretely and particularly described for each Plaintiff dealer in paragraphs 88 through 228 of this Complaint." App. at 67. Later the point is repeated: "Ford's Blue Oval requirements are coercive, unreasonable, intrusive, discriminatory, costly to the dealer, and fraught with material business uncertainties." Id. at 85.

9

Ford argues, and the District Court apparently found, that these allegations were not specific enough. The dealers respond by pointing to the body of the Complaint, which discusses four types of injury at length.

The first kind of injury is the out-of-pocket expenses Plaintiffs made to become BOP-certified. "The Certification and Recertification process," they claim, "has required and continues to require substantial expenditures of dealership resources." Complaint ¶ 12. "All Plaintiffs have made, proportionally, very significant out-of-pocket investments to comply with Ford's requirements to become Certified and Recertified under the Blue Oval Program." Id. ¶ 59. "In satisfying the required [Facilities] criteria, however, the dealers' investment has already increased sizably." Id. ¶ 94. Plaintiffs even break down the amount of money spent per dealership.[3]

There can be no doubt that this financial harm counts as injury-in-fact. Because we are bound to read the complaint as true, we cannot ignore Plaintiffs' claims that the BOP is "illegal," Complaint ¶ 3, "imposed" upon them, id. ¶ 2; "compelled," id. ¶ 47, and "coercive," id. ¶ 95. Once this is accepted, the allegations are indistinguishable from a garden-variety civil lawsuit: a plaintiff sues a defendant for illegally causing the plaintiff harm. See, e.g., General Motors Corp. v.

---

[3]Danvers Motor Company avers that becoming BOP-certified required an additional $65,000 in management expenditures, and $25,000 more per year for an extra employee. App. at 86. Augusta Ford says it cost $155,626 in various expenses, less a reimbursement of $49,000. Id. at 87. Condon Ford lost an estimated $25,000 per year due to decertification. Id. at 90. Fette Ford spent $68,200 in dealer costs and another $87,000 in personnel costs to become certified. Id. at 95. Senator Ford claims losses of $116,360 in maintenance and additional employee hours, among other things. Id. at 97. Roseville Midway Ford allegedly spent $250,000 to become certified, id. at 99, and Tildon Ford states that it spent $84,000 in personnel expenses, as well as additional expenses for a consultant. Id. at 104.

Tracy, 519 U.S. 278, 286 (1997) (customers who pay more for a product because of a regulation allegedly "forbidden under the Commerce Clause satisfy the standing requirements of Article III") (citing Bacchus Imports, Ltd. v. Dias, 486 U.S. 263, 267 (1984)); NRA of America v. Magaw, 132 F.3d 272, 281 (6th Cir. 1997) (gun manufacturers and dealers have standing to challenge the constitutionality of a law banning certain types of guns because the law caused them "immediate economic harm").

Monetary harm is a classic form of injury-in-fact. See Adams v. Watson, 10 F.3d 915, 920–25 & n.13 (1st Cir. 1993) (collecting cases). Indeed, it is often assumed without discussion. In Videon Chevrolet, Inc. v. General Motors Corp., for example, a dealer challenged the "Chevrolet Dealer Association Marketing Initiative," which (like the BOP) added a "mandatory surcharge" of 1% on every vehicle sold to the dealer without adjusting the manufacturer's suggested retail price. 992 F.2d 482, 483–84 & n.1 (3d Cir. 1993). The Court discussed at length whether General Motors violated any law, but it never questioned Videon's standing. The obvious fact that Videon was forced to pay money it otherwise would have kept for itself was sufficient to confer Article III standing. The same principle applies here: Plaintiffs unequivocally state that Ford's "illegal" BOP forced them to spend money against their will.[4]

The second form of injury Plaintiffs allege is a loss of control over day-to-day dealership activities. They allege that "[t]he Certification and Recertification process illegally intrudes into the dealers' operations." Id. ¶ 12. "The Blue Oval Facilities criteria include all the ordinary routine aspects of running the dealership that have always been and are the normal responsibilities and concerns of the dealer, without Ford's or its

---

[4]Plaintiffs' complaint in this case is more direct than the one before the Danvers I Court. It repeatedly states that the Plaintiffs have suffered injuries because of the BOP, not that they might suffer them in the future. Because the latest version of the complaint is not speculative, the Danvers I rationale cannot control here.

agents' intrusion." Id. ¶ 88; see also id. ¶ 45 ("The Blue Oval Program lays out highly detailed requirements . . . [which] exceed the obligations of the dealer in the Franchise Agreement."); id. ¶ 94 ("In satisfying the required [Facilities] criteria, however, the dealers' . . . freedom and control of [their] investment [in Facilities] to satisfy their respective markets has proportionally declined.").

Although this injury is more difficult to monetize, it is no less cognizable under Article III. At its heart, the alleged injury is an invasion of the Plaintiffs' property rights. Without the BOP, the dealers claim that they had greater freedom to organize and run their businesses as they saw fit. This form of harm, whether it sounds in tort (loss of control over dealership operations) or contract (violation of Plaintiffs' franchise agreements), undoubtedly "affect[s] the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1.

We hold that these two forms of injury—forced expenditures of money and loss of control—are sufficiently concrete for the purposes of Article III. Because they alone suffice, we need not address Plaintiffs' two other forms of alleged injury: loss of interest payments on the 1% per vehicle mark-up and the future threat of de-certification.[5]

## IV.

Injury-in-fact is not Mount Everest. See Bowman v.

---

[5]We do not address other questions that Plaintiffs raise relating to antitrust standing, because Plaintiffs proffered before the District Court that constitutional standing would be the only issue on appeal, the District Court thereby certified the appeal under Fed. R. Civ. P. 54(b) as relating only to its denial of the motion to dismiss for lack of constitutional standing, and Ford agrees that the issue is inappropriate for consideration in this appeal. App. at 49–51; Ford's Brief at 19. Cf. Bagot v. Ashcroft, 398 F.3d 252, 256 (3d Cir. 2005) ("[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument in this Court" (internal citation and quotations omitted)).

12

Wilson, 672 F.2d 1145, 1151 (3d Cir. 1982) ("The contours of the injury-in-fact requirement, while not precisely defined, are very generous," requiring only that claimant "allege[] some specific, 'identifiable trifle' of injury"). Plaintiffs alleged that the BOP illegally caused them economic injury and a loss of control over dealership activities. On a motion to dismiss, this much is sufficient.

We reverse order of the District Court, and remand for further proceedings.