Hughes, Circuit Judge, concurring.
Because our recent precedent compels holding that General Electric Company lacks Article III standing here, I concur in the judgment. I write separately because I believe that precedent has developed an overly rigid and narrow standard for Article III standing in the context of appeals from inter partes review proceedings.
Our recent decision in AVX Corp. v. Presidio Components, Inc. , 923 F.3d 1357 (Fed. Cir. 2019), which I believe was incorrectly decided, takes a patent-specific approach to the doctrine of competitor standing that is out of step with Supreme Court precedent. The Court has repeatedly held that government actions altering the competitive landscape of a market cause competitors probable economic injury sufficient for Article III standing. And I do not believe that a Board decision erroneously upholding a competitor's patent in an IPR is meaningfully different from the type of government actions held to invoke competitor standing in those cases. Thus, absent our holding in AVX Corp. , I would conclude that GE possesses Article III standing in this appeal.
I
The parties here are direct competitors in the commercial aircraft turbofan engine market. GE, both itself and through joint ventures, "designs, tests, certifies, manufactures, and supplies aircraft engines" for major airplane manufacturers, or "airframers," such as Boeing and Airbus. Decl. of Alexander E. Long 2 ¶ 3, ECF No. 36. During the design process, "airframers explain to GE their needs and requirements for turbofan engines, to enable GE to provide competitive offerings that will satisfy the airframers' requirements." Suppl. Decl. of Alexander E. Long 2 ¶ 3, ECF No. 64.
Due to the safety and regulatory requirements of the turbofan engine market, "designing, developing, testing, and certifying a new aircraft engine can take eight to ten years or longer." Long Decl. 3 ¶ 6. And "[t]here is enormous up-front investment required." Long Decl. 4 ¶ 7. Accordingly, "new aircraft engine design work necessarily begins years before there is any commercial sale or offer for sale of the final engine." Long Decl. 4 ¶ 8.
According to GE, competition in the aircraft engine market is fierce, and the market is dominated by three major players: GE, Universal Technologies Corporation, and Rolls-Royce. GE petitioned for IPR of a patent owned by UTC. That patent is directed to a turbofan engine design - the *1356 very type of technology over which GE and UTC fiercely compete. The Board decided that GE failed to show that the challenged claims were unpatentable, and GE appealed that decision to this Court.
UTC filed a motion to dismiss the appeal, arguing that GE lacks Article III standing because GE does not produce or plan to produce an engine that would infringe its patent. Relying on precedent of both this Court and the Supreme Court, GE argued that the Board's decision to uphold UT's patent caused GE a concrete competitive injury sufficient to satisfy Article III standing.
II
The sole issue with respect to standing in this case is whether GE has shown that it has suffered an injury-in-fact. An injury-in-fact requires a party to establish "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defs. of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). This requirement "ensure[s] that the plaintiffs have a stake in the fight and will therefore diligently prosecute the case ... while, at the same time, ensuring that the claim is not abstract or conjectural so that resolution by the judiciary is both manageable and proper." Canadian Lumber Trade All. v. United States , 517 F.3d 1319, 1333 (Fed. Cir. 2008) (internal quotation marks omitted); see also Massachusetts v. E.P.A. , 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) ("At bottom, 'the gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.' " (quoting Baker v. Carr , 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) )). But "[i]njury-in-fact is not Mount Everest." Canadian Lumber , 517 F.3d at 1333 (quoting Danvers Motor Co. v. Ford Motor Co. , 432 F.3d 286, 294 (3d Cir. 2005) ); accord Bowman v. Wilson , 672 F.2d 1145, 1151 (3d Cir. 1982) ("The contours of the injury-in-fact requirement, while not precisely defined, are very generous.").
Many of our recent cases dealing with injury-in-fact in IPR appeals have focused on the appellant/petitioner's likelihood of facing a future infringement suit. See JTEKT Corp. v. GKN Auto. LTD. , 898 F.3d 1217, 1220 (Fed. Cir. 2018) (noting that "typically in order to demonstrate the requisite injury in an IPR appeal, the appellant/petitioner must show that it is engaged or will likely engage 'in an[ ] activity that would give rise to a possible infringement suit,' ... or has contractual rights that are affected by a determination of patent validity" (quoting Consumer Watchdog v. Wis. Alumni Research Found. , 753 F.3d 1258, 1262 (Fed. Cir. 2014) )); see also Momenta Pharm., Inc. v. Bristol-Myers Squibb Co. , 915 F.3d 764, 769-70 (Fed. Cir. 2019) (holding that an IPR petitioner lacked standing because it had abandoned its plans for developing a potentially infringing product, so it no longer faced a potential infringement suit); E.I. Dupont de Nemours & Co. v. Synvina C.V. , 904 F.3d 996, 1004 (Fed. Cir. 2018) (holding that an IPR petitioner had suffered an injury in fact because it "currently operates a plant capable of infringing" the challenged patent); Phigenix, Inc. v. Immunogen, Inc. , 845 F.3d 1168, 1173-74 (Fed. Cir. 2017) (noting that appellant "does not contend that it faces risk of infringing the [challenged] patent, that it is an actual or prospective licensee of the patent, or that it otherwise plans to take any action that would implicate the patent"); Consumer Watchdog , 753 F.3d at 1262 (noting that the appellant/petitioner "is not engaged in any activity that would give rise to a possible *1357 infringement suit"). But these cases do not suggest that the only means for an IPR petitioner to establish injury-in-fact is to show a reasonable likelihood of an imminent infringement suit. Such a reading would conflate the injury-in-fact analysis with the "reasonable apprehension of imminent suit" test for declaratory judgment jurisdiction, which the Supreme Court overruled. See MedImmune, Inc. v. Genentech, Inc. , 549 U.S. 118, 132 n. 11, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (noting that the "reasonable apprehension of suit" test conflicts with Supreme Court precedent); see also ABB Inc. v. Cooper Indus., LLC , 635 F.3d 1345, 1348 (Fed. Cir. 2011) (recognizing that MedImmune rejected the requirement of a "reasonable apprehension of imminent suit" to establish declaratory judgment jurisdiction).
The risk of a future infringement suit is not the only way an IPR petitioner can show injury-in-fact. "The [Supreme Court] routinely recognizes probable economic injury resulting from [government actions] that alter competitive conditions as sufficient to satisfy the [Article III injury-in-fact requirement]." 3 K. Davis & R. Pierce, Administrative Law Treatise 13-14 (3d ed. 1994); see also Clinton v. City of New York , 524 U.S. 417, 433, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (citing David & Pierce, supra , at 13-14). This Court's recent decision in AVX Corp. addressed the competitor standing doctrine in IPR appeals. We held that a patent could cause an IPR petitioner competitive harm if the petitioner "was currently using the claimed features [of the challenged patent] or nonspeculatively planning to do so in competition." AVX Corp. , 923 F.3d at 1365. But if the petitioner is not currently engaged in infringing activity and has no concrete plans to do so in the imminent future, we held that the Board's decision to uphold a challenged patent does not invoke the competitor standing doctrine. Id.
Thus, even when the parties are direct competitors, our cases require an unsuccessful IPR appellant/petitioner to show concrete current or future plans to infringe the challenged patent. I do not believe that Article III requires such a showing, particularly where Congress has provided IPR petitioners a procedural right of appeal. See 35 U.S.C. § 141 ; see also Consumer Watchdog , 753 F.3d at 1261 (recognizing that "where Congress has accorded a procedural right to a litigant, such as the right to appeal an administrative decision, certain requirements of standing-namely immediacy and redressability, as well as prudential aspects that are not part of Article III-may be relaxed").
AVX Corp. found that the "government action at issue [in IPR] is quite different" from the government action in other cases applying competitor standing. AVX Corp. , 923 F.3d at 1365. According to AVX Corp. , the "feature-specific exclusivity right [of a patent] does not, by the operation of ordinary economic forces, naturally harm a firm just because it is a competitor in the same market as the beneficiary of the government action (the patentee)." Id. This analysis sets patents apart from other applications of competitor standing on the basis that a patent's exclusivity right is different than other interests. The Supreme Court, however, has made clear that "[p]atent law is governed by the same common-law principles, methods of statutory interpretation, and procedural rules as other areas of civil litigation." SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC , --- U.S. ----, 137 S. Ct. 954, 964, 197 L.Ed.2d 292 (2017) (internal quotation marks omitted).
Our patent-specific treatment of competitor standing is out of step with its application in other areas. The Supreme Court has repeatedly found standing where government action subjects the plaintiff to *1358 increased competition because of the probable economic injury that accompanies it. See Clinton , 524 U.S. at 433, 118 S.Ct. 2091 ; Ass'n of Data Processing Serv. Orgs., Inc. , 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ; Inv. Co. Inst. v. Camp , 401 U.S. 617, 620, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) ; accord Canadian Lumber , 517 F.3d at 1334 ; La. Energy & Power Auth. v. FERC , 141 F.3d 364, 367 (D.C. Cir. 1998). In Data Processing , for example, the petitioners - organizations who sold data processing services to businesses - challenged a ruling by the Comptroller of Currency that allowed national banks to provide data processing services to other banks and bank customers. 397 U.S. at 151, 90 S.Ct. 827. The Supreme Court held that the Comptroller's ruling caused petitioners an injury-in-fact because the resulting increase in competition would likely cause petitioners future economic harm. Id. at 152, 90 S.Ct. 827. Similarly, in Clinton the Supreme Court held that a farmers' cooperative suffered a concrete injury when the president cancelled a tax benefit enacted to facilitate the purchase of processing plants by such cooperatives. 524 U.S. at 432, 118 S.Ct. 2091. The Court found that "[b]y depriving [the cooperative] of their statutory bargaining chip, the cancellation inflicted a sufficient likelihood of economic injury to establish standing under our precedents." Id.
In both Data Processing and Clinton , the government action subjected the challenger to increased competition. The exclusionary right of a patent, however, allows the patent owner to exclude others from competing in its market. But like an action that increases competition, government action that excludes an appellant from effectively competing in a market, such as erroneously upholding its competitor's patent, provides a benefit to the competitor and causes competitive harm to the appellant that presumptively leads to economic injury. See Canadian Lumber , 517 F.3d at 1332 (noting that competitor standing "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors " (emphasis added)). Thus, I do not believe there is any sound basis for AVX Corp. 's patent-specific treatment of the competitor standing doctrine.
The facts of this case further demonstrate why AVX Corp. 's patent-specific approach is incorrect. GE and UTC are direct competitors in a fiercely competitive market that requires significant up-front investment years before any profits can be realized. During the engine design process, "airframers explain to GE their needs and requirements for turbofan engines, to enable GE to provide competitive offerings that will satisfy the airframers' requirements." Long Suppl. Decl. at 2 ¶ 3. According to GE, one such air-framer specifically requested that GE research an engine design that would implicate UTC's patent. But at least until that patent expires, GE cannot design and produce such an engine without risking infringement. Thus, UTC's patent effectively precludes GE from meeting its customer's design needs without spending additional resources to design around the patent.[1] I fail to see how this costly competitive burden does not constitute a "concrete and particularized"
*1359 harm to GE. See Lujan , 504 U.S. at 560, 112 S.Ct. 2130. And GE certainly has a "personal stake in the outcome of th[is] controversy," which concerns the validity of a patent owned by its direct competitor covering technology over which the parties compete. E.P.A. , 549 U.S. at 517, 127 S.Ct. 1438 (internal quotation marks omitted).
Finally, as the majority correctly notes, we have repeatedly held that the estoppel provisions of 35 U.S.C. § 315(e), standing alone, do not create an injury. Maj. Op. 1354-55. But the effects of that estoppel have especially significant impact where the parties are direct competitors. Unlike the appellant/petitioners in Consumer Watchdog or Phigenix , who did not manufacture or sell products in the market involving the patented technology, see Consumer Watchdog , 753 F.3d at 1260 ; Phigenix , 845 F.3d at 1171, GE is one of three major actors in the turbofan engine market. Although we have not decided whether § 315(e) would estop an IPR petitioner who lacked standing to appeal an unfavorable Board decision, see AVX Corp. , 923 F.3d at 1363, until we do, UTC's patent is an even greater competitive deterrent for GE. GE faces uncertainty as to whether it is estopped from raising an invalidity defense on any ground "that [it] raised or reasonably could have raised during" its IPR. See § 315(e)(2). This uncertainty makes facing potential infringement litigation significantly more impactful on GE's future design choices. Thus, while I agree that 35 U.S.C. § 315(e) estoppel alone does not create an injury-in-fact, its potential effects in this case underscore the problems with our increasingly narrow approach to Article III standing.
Absent AVX Corp. , which I believe was incorrectly decided, I would conclude that GE has established Article III standing to appeal the Board's adverse decision. Because I am bound by that precedent, however, I respectfully concur only in the judgment.

In Biotechnology Industry Organization v. District of Columbia , we found that "[w]hether the Act is enforced or not," pharmaceutical manufacturers challenging a statute that penalized selling prescription drugs at "excessive price[s]" could demonstrate injury-in-fact due to the "actual administrative costs" they would necessarily incur in complying with the statute. 496 F.3d 1362, 1370-71 (Fed. Cir. 2007). Those "actual administrative costs" are analogous to the increased research and design costs that GE has allegedly suffered due to UTC's patent.