**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
————————

No. 21-2205
————————

JODY LUTTER,
Appellant

v.

JNESO, an incorporated employees labor organization;
COUNTY OF ESSEX; PHIL MURPHY, in his official
capacity as Governor of New Jersey; GURBIR S. GREWAL,
in his official capacity as Attorney General of New Jersey;
JOEL M. WEISBLATT; PAUL BOUDREAU; PAULA B.
VOOS; JOHN BONANNI; DAVID JONES; PASQUALE V.
PAPERO, in their official capacities as members of the New
Jersey Public Employment Relations Commission

————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1-19-cv-13478)
District Judge:  Honorable Renée M. Bumb

————————

Argued:  May 25, 2022

Before:  KRAUSE, BIBAS, and PHIPPS, *Circuit Judges*.

(Filed: November 6, 2023)

_____

Patrick J. Wright     **[Argued]**
MACKINAC CENTER LEGAL FOUNDATION
140 West Main Street
Midland, MI 48640

Matthew C. Moench
KING MOENCH & COLLINS
51 Gibraltar Drive
Suite 2F
Moore Plains, NJ 07950

*Counsel for Appellant*

Seth Ptasiewicz     **[Argued]**
KROLL HEINEMAN PTASIEWICZ & PARSONS
91 Fieldcrest Avenue
Suite 35
Edison, NJ 08837

*Counsel for Appellee JNESO*

Alan Ruddy
OFFICE OF COUNTY COUNSEL
COUNTY OF ESSEX
465 Martin Luther King Boulevard
Hall of Records, Room 535
Newark, NJ 07102

*Counsel for Appellee County of Essex*

2

Angela Cai        **[Argued]**
Ryan J. Silver
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
25 Market Street
Richard J. Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625

Caroline G. Jones
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
DIVISION OF LAW
25 Market Street
Hughes Justice Complex
Trenton, NJ 08625

   *Counsel for Appellees Governor Phil Murphy and
   Attorney General Gurbir S. Grewal*

Christine R. Lucarelli
PUBLIC EMPLOYMENT RELATIONS COMMISSION
495 West State Street
P.O. Box 429
Trenton, NJ 08625

   *Counsel for Appellees Joel M. Weisblatt, Paul
   Boudreau, Paula B. Voos, John Bonanni, Pasquale V.
   Papero, and David Jones*

_____

OPINION OF THE COURT

_____

PHIPPS, *Circuit Judge*.

In late June 2018, the Supreme Court held that public-sector unions could not charge fees from non-union employees to fund collective bargaining efforts, as those unions were

previously able to do in New Jersey. Shortly afterwards, a nurse at a county hospital in New Jersey requested in writing to resign from the public-sector union that represented her and to have her employer cease deducting union dues from her paycheck so that she would pay neither dues nor fees. But a state statute established an annual ten-day period during which public-sector employees could revoke a prior authorization for payroll deductions of union dues. And that ten-day period for the nurse expired in early June, before the Supreme Court's decision. On that basis, her request to cease payroll deductions was denied, and the county deducted union dues from her paycheck for the next ten months. Once her annual ten-day revocation window reopened, the nurse resubmitted her request, and the county ceased payroll deductions of union dues.

Within a week of her second request, the nurse filed this suit against the union, the county, and several state officials under 42 U.S.C. § 1983. She claimed that delaying her ability to stop paying union dues violated her First Amendment right by compelling her to subsidize union speech. For relief, the nurse requested damages from the union to compensate her for the payroll deductions of her union dues. In addition to seeking attorney's fees and costs, she sought among other things, an order enjoining future deductions of union dues from her paycheck and a declaratory judgment that the state statute was unconstitutional.

About nine months later, in March 2020, the union sent her a check in the amount of the deducted union dues plus interest. By then, the nurse was no longer a member of the union, and she did not cash or deposit that check. But the union, along with other defendants, used her receipt of that check along with her resignation from the union as grounds for requesting dismissal of the suit as moot – an outcome that would eliminate their exposure to liability for attorney's fees. The defendants also argued for dismissal on other grounds, including the nurse's lack of Article III standing. The District Court granted

4

those motions and dismissed the case through two separate orders.

The nurse has now appealed, and on *de novo* review, the check she received after her resignation from the union did not moot her damages claims against the union. But the nurse – as a non-union member no longer subject to payroll deductions of union dues – lacks standing for her claims against the other parties and for her additional requests for relief against the union. Accordingly, we will affirm the District Court's orders in part, vacate them in part, and remand the damages claim against the union to the District Court for resolution.

FACTUAL BACKGROUND (AS ALLEGED IN THE PLEADINGS)

On May 31, 2011, Jody Lutter began her employment with Essex County, New Jersey, as a nurse at the Essex County Hospital. She worked in a position within a bargaining unit represented by JNESO, a labor union.

At that time, under *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), a public-sector union could charge fees from non-union members whom the union represented in collective bargaining without offending the First Amendment's prohibition on the compelled subsidization of speech. *Id.* at 235–36. And under a New Jersey statute, public-sector unions could deduct a "representation fee" from the wages of non-union employees whom it represented. N.J. Stat. Ann. §§ 34:13A-5.5 to -5.6 (West 2011). The money collected by a representation fee, also referred to as an 'agency fee,' could not be used for political advocacy, *see Abood*, 431 U.S. at 235–36, and the statute capped such fees at 85% of regular union membership dues, fees, and assessments, N.J. Stat. Ann. § 34:13A-5.5(b). JNESO's collective bargaining agreement with Essex County authorized the collection of agency fees from its non-union employees.

Thus, when Lutter began working for Essex County in 2011, she had to contribute to JNESO, and she had two options

5

for doing so. She could join JNESO and pay full dues. Or she could not join JNESO and pay a portion of those dues as an agency fee. Lutter chose the former: she joined JNESO and authorized payroll deductions of her union dues within a month of her start date.

Six years later, in September 2017, the Supreme Court granted a petition for certiorari to reconsider *Abood* and the constitutionality of agency fees. *See Janus v. Am. Fed'n*, 582 U.S. 966 (2017) (mem.) (granting petition for certiorari). That issue, if resolved against the rule of *Abood*, had the potential to significantly decrease the revenues of public-sector unions because employees, by resigning from the union, could avoid paying not only union dues but also agency fees.

With the looming possibility that the Supreme Court in *Janus* would overrule *Abood* and by so doing prompt a membership exodus from public-sector unions, the New Jersey Legislature enacted the Workplace Democracy Enhancement Act (the 'WDEA'). Under that statute, which became effective on May 18, 2018, a union member could revoke an authorization for payroll deductions only during the ten days following the anniversary of that member's employment start date. *See* 2018 N.J. Sess. Law Serv. Ch. 15 (West) (codified at N.J. Stat. Ann. § 52:14-15.9e (West Supp. 2021) (amended 2022)). If a union member provided notice to his or her employer within that ten-day window, then the employer had to notify the union within five days and cease payroll deductions of union dues within thirty days of the employee's anniversary date. *See id.* By contrast, the version of the statute in effect when Lutter joined JNESO allowed union members to give a notice of revocation at any time, and that notice would take effect the following January 1 or July 1, whichever came sooner. *See* N.J. Stat. Ann. § 52:14-15.9e (West 2011) (amended 2018, 2022).

A little over a month after the WDEA's enactment, the Supreme Court, on June 27, 2018, decided *Janus*. It

6

overturned *Abood* and held that the First Amendment prohibits public-sector unions from collecting agency fees from nonmembers without their clear and affirmative consent. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2486 (2018).

By operation of the WDEA, however, Lutter could not immediately avail herself of the flexibility that *Janus* afforded. Instead, because her May 31 anniversary date had passed less than a month beforehand, she would have to wait nearly a year to be eligible to revoke her authorization for the payroll deductions of her union dues. And even after that notice, those union dues could still be deducted from her paycheck for thirty days after her anniversary date.

Lutter attempted to avoid that expensive wait. In a letter dated July 12, 2018, to Essex County, with a copy to JNESO, she requested that the payroll deductions of her union dues cease and she announced her resignation from JNESO. In an email response, Essex County stated that Lutter could not revoke her authorization for the payroll deductions of her union dues for nearly a year – until June 2019, during the next ten-day period permitted by the WDEA. True to its stated position, Essex County deducted union dues from Lutter's paycheck for the next ten months.

On June 1, 2019, as soon as her ten-day revocation window under the WDEA re-opened, Lutter sent a letter to Essex County, with a copy to JNESO, indicating that she wanted the payroll deductions of union dues to cease. Her next paycheck, dated June 14, 2019, which covered the two-week pay period beginning on May 25 and ending on June 7, did not have any union dues deducted.

## PROCEDURAL HISTORY

On June 6, 2019, within a week of sending her second letter, Lutter filed this lawsuit under 42 U.S.C. § 1983 in District Court. As revised by a pleading labeled as an 'amended

7

complaint,' filed on February 28, 2020, Lutter sued JNESO and Essex County along with several state officials in their official capacities: the Governor, the Attorney General, and members of the New Jersey Public Employment Relations Commission. Her first count asserted that through their compliance with the WDEA, those defendants violated her First Amendment right against the compelled subsidization of speech by preventing her from immediately resigning from JNESO following *Janus*. In her second count, Lutter argued that her prior authorization for payroll deductions lost its consensual character after *Janus* held that agency fees are illegal, and thus the post-*Janus* deductions of union dues from her paycheck similarly transgressed the protections of the First Amendment.

In her prayer, Lutter sought several forms of relief. She requested compensatory damages from JNESO for the union dues that were deducted from her paycheck for the ten months after her attempted resignation on July 12, 2018.[1] She also sought an order enjoining JNESO from collecting further dues from her and preventing the New Jersey officials from enforcing the WDEA. In addition, she sought declaratory judgments that (i) the WDEA is void and unenforceable and (ii) members of public-sector unions have a constitutional right

---

[1] In her second complaint, Lutter seeks a refund of union dues deducted from her paychecks, and that request could be interpreted as seeking compensatory damages or specific performance. But Lutter does not seek the return of "*specific currency or coins*," *Bowen v. Massachusetts*, 487 U.S. 879, 919 n.3 (1988) (Scalia, J., dissenting), and in her briefing, Lutter makes clear that she seeks compensatory damages and thus her request is most reasonably construed as a request for damages. *See id.* at 918–19 ("Almost invariably, however, suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied . . . .").

to resign from the union and cease paying union dues at any time.  Lutter sought the ancillary relief of attorney's fees and costs, *see* 42 U.S.C. § 1988(b), and she included a request for all other relief deemed just, proper, and equitable.  As a case implicating federal questions and her civil rights, Lutter's action was putatively within the District Court's original subject-matter jurisdiction.  *See* 28 U.S.C. §§ 1331 (federal-question jurisdiction), 1343 (jurisdiction over cases involving the deprivation of the rights or privileges of United States citizens).

Shortly after Lutter filed her second complaint, JNESO attempted to refund the dues that she had requested.  In correspondence sent to Lutter's counsel on March 12, 2020, JNESO's attorney enclosed a check in the amount of $1,209.58.  The accompanying letter explained that JNESO was not "seeking any conditions or promises from Ms. Lutter," and that "[t]he check is sent to refund the dues that were deducted from [her paychecks] after she declared her desire to resign from membership in JNESO, along with an amount to reflect accrued interest."  Letter from Seth Ptasiewicz, Counsel for JNESO, Kroll, Heineman, Carton, to Matthew C. Moench, Counsel for Jody Lutter, King, Moench, Hirniak & Mehta, LLP (Mar. 12, 2020) (JA85).  Lutter did not cash the check promptly – or ever.

JNESO then relied on that correspondence and Lutter's resignation from the union in moving to dismiss Lutter's second complaint.  Based on those developments, JNESO asserted that Lutter's claims for compensatory damages were moot.  Also, because Lutter was not a member of JNESO when she filed her second complaint, JNESO argued that she lacked

9

Article III standing for her requests for injunctive and declaratory relief.[2]

In subsequent filings, the other defendants joined JNESO's mootness argument. Essex County gave notice that it agreed with JNESO that the case was moot. In their separate motion to dismiss, the members of the Public Employment Relations Commission argued that Lutter's case should be dismissed on mootness grounds as well.[3] Although they initially responded to Lutter's second complaint by filing an answer, the Governor and Attorney General later filed a brief supporting JNESO's mootness and standing arguments.

Through two separate rulings, the District Court dismissed all of Lutter's claims. It concluded that by providing the check to Lutter, JNESO mooted her damages claim. It also dismissed her requests for injunctive relief because by the time of her second complaint, she had resigned from the union. After receiving supplemental briefing, the District Court further dismissed Lutter's requests for declaratory relief because, as a non-union employee, she lacked Article III standing to litigate whether the WDEA is unconstitutional and whether a member of a public-sector union has a constitutional right to immediately resign from the union. Lutter timely appealed,

---

[2] In the alternative, JNESO argued that Lutter's claims failed to state a claim for relief because *Janus* did not invalidate previous valid authorizations of payroll deductions of union dues and because JNESO was not a state actor subject to suit under § 1983.

[3] The members of the Commission also argued for a lack of subject-matter jurisdiction due to Eleventh Amendment immunity. In addition, they moved in the alternative to dismiss for failure to state a claim for relief on the grounds that *Janus* applied only to non-union employees who paid agency fees and that the Commission did not enforce or administer the WDEA.

bringing her suit within this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291; Fed. R. App. P. 4(a)(1)(A).

During the pendency of this appeal, on January 18, 2022, New Jersey enacted the Responsible Collective Negotiations Act. That legislation eliminated the WDEA's ten-day window for a public-sector union member to revoke a prior authorization for the payroll deductions of union dues. *See* 2021 N.J. Sess. Law Serv. Ch. 411, at 6 (West) (codified at N.J. Stat. Ann. § 52:14-15.9e). Under that statutory revision, an employee, like Lutter, who had authorized the payroll deductions of union dues before the WDEA's effective date, could revoke that authorization "in accordance with the law in effect at the time of [her] initial authorization of payroll deduction[s]" or within the terms set forth by that authorization. *Id.* If that law had been in place at the time of the *Janus* decision, then Lutter could have revoked her authorization for the payroll deductions of union dues at any time.

## DISCUSSION

On appeal, the lines of argument mirror those presented in the District Court. Lutter asserts that her claims and requests for damages, injunctions, and declaratory judgments are justiciable. The defendants dispute Lutter's standing to seek injunctive and declaratory relief, and they argue that her claim for damages has been mooted by JNESO's presentment of the check to Lutter's counsel.[4]

---

[4] In addition to the justiciability challenges, the defendants argue that the District Court's ruling can be affirmed on other grounds. JNESO contends that Lutter fails to state a claim for relief for two reasons: *Janus* did not invalidate her previous authorization of the payroll deductions of union dues and JNESO is not a state actor. The members of the Commission argue that the dismissal of the claims against them may be

11

## A. Article III Standing

In partial effectuation of the Preamble, which announced the intention to "establish Justice," Article III of the Constitution creates and defines the judicial power of the United States. U.S. Const. pmbl.; *id.* art. III. One limitation on that power is its applicability to only certain types of cases and controversies. Article III identifies, by subject matter, three categories of cases that are within the federal judicial power, and it specifies, by the parties thereto, six categories of controversies subject to the federal judicial power. *Id.* art. III, § 2. Beyond those limitations based on subject matter and party, the terms 'cases' and 'controversies' themselves have meaning. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982) ("The constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity 'to adjudge the legal rights of litigants in actual controversies.'" (quoting *Liverpool S.S. Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39 (1885))).[5] They require genuine

---

upheld due to Eleventh Amendment immunity. The Governor and the Attorney General point out that Lutter's constitutional challenges depend on the ten-day revocation window in the WDEA, which has not been construed by any court, and they advocate for certification of those issues related to the WDEA to the New Jersey Supreme Court. *See* N.J. R. App. Prac. 2:12A-1 ("The Supreme Court may answer a question of law certified to it by the United States Court of Appeals for the Third Circuit, if the answer may be determinative of an issue in litigation pending in the Third Circuit and there is no controlling appellate decision, constitutional provision, or statute in this State.").

[5] As originally understood, 'cases' was the broader term, encompassing civil and criminal lawsuits, while 'controversies' referred only to civil suits. *See Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239 (1937) ("The

12

adversity among at least two parties to the litigation,[6] and they prevent advisory opinions.[7] If the judicial power were to extend beyond cases and controversies, then federal courts would exceed "the traditional role of Anglo-American courts," *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009), and they could encroach on the powers of the other two Branches – to say nothing of their potential to impermissibly interfere with States and the people, *see Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 408 (2013); *Allen v. Wright*, 468 U.S. 737, 752 (1984).

The doctrine of Article III standing represents an additional limitation on the federal judicial power derived from the case-

---

term 'controversies,' if distinguishable at all from 'cases,' is so in that it is less comprehensive than the latter, and includes only suits of a civil nature." (quotation and citation omitted)); *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 431–32 (1793) (opinion of Iredell, J., dissenting); *see also* Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 168 (1992) ("In the original understanding, 'cases' included both civil and criminal disputes, whereas 'controversies' were limited to civil disputes.").

[6] *See United States v. Johnson*, 319 U.S. 302, 305 (1943) (dismissing a case on jurisdictional grounds due to the absence of a genuine adversary issue between the parties); *see also GTE v. Sylvania, Inc. v. Consumers Union of the U.S., Inc.*, 445 U.S. 375, 382–83 (1980).

[7] *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." (citing C. Wright, *Law of Federal Courts* 34 (1963)); *Muskrat v. United States*, 219 U.S. 346, 354 (1911) (describing the Supreme Court's refusal in 1793 to advise President George Washington on issues of foreign affairs during the war between France and England).

13

or-controversy requirement. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (recognizing that "the doctrine of standing derives from the case-or-controversy requirement"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."). At the pleading stage, to have Article III standing, a litigant invoking the power of a federal court must plausibly allege (i) an injury-in-fact (ii) that is fairly traceable to the conduct of the party sued, and (iii) that is judicially redressable. *See Spokeo*, 578 U.S. at 338; *Lujan*, 504 U.S. at 560–61; *see also Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327–28 (3d Cir. 2022) (summarizing the plausibility pleading standard). Such a party must meet those requirements "for each claim that [it] press[es] and for each form of relief that [it] seek[s]." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross.").

As far as timing, the general rule is that a plaintiff in federal court must have Article III standing on the date the lawsuit was commenced. *See Davis*, 554 U.S. at 734 ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."). But under Rule 15, the complaint initiating the lawsuit may later be amended and supplemented. *See* Fed. R. Civ. P. 15(a), (d).[8] An amendment revises the allegations,

---

[8] Although parties and courts often refer to any revision to a pleading as an 'amendment,' that is a potential misnomer because the text of Rule 15 treats amendment and supplementation differently. *Compare* Fed. R. Civ. P. 15(a), *with id.* 15(d); *see Wilcox v. Miller*, 691 F.2d 739, 740 n.1 (5th Cir. 1982) (recognizing that parties often confuse amendment and supplementation); 6A Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1504 (3d ed. 2019)

claims, and prayers for relief in a complaint to reflect the state of things *as of* the date the action was commenced. *See Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019) (explaining that amendment allows the inclusion of "matters that were overlooked or were unknown at the time the party interposed the original complaint" (citation omitted)); 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1473 (3d ed. 2010) [hereinafter '*Federal Practice and Procedure*'] (explaining that an amended pleading should relate only "to matters that have taken place prior to the date of the earlier pleading"). By contrast, supplementation adds or alters allegations, claims, or prayers for relief in the complaint based on events that occurred *after* the initiation of the lawsuit. *See Garrett*, 938 F.3d at 82.[9]

Amended complaints and supplemental complaints differ in their treatment of the date upon which a plaintiff must establish Article III standing. An amended complaint – while the operative pleading for purposes of evaluating the sufficiency of the allegations, the viability of the claims, and the requested relief[10] – does not restart the date for assessing

("Parties and courts occasionally confuse supplemental pleadings with amended pleadings and mislabeling is common.").

[9] *See also T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 326 (3d Cir. 2019) ("Supplemental pleadings . . . are limited to subsequent events related to the claim or defense presented in the original pleading." (quoting 3 James Wm. Moore et al., *Moore's Federal Practice* ¶ 15.30 (3d ed. 2018))); 6A *Federal Practice and Procedure* § 1504 (explaining that supplemental pleadings "deal with events subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings").

[10] *See Saint-Jean v. Palisades Interstate Park Comm'n*, 49 F.4th 830, 835 (3d Cir. 2022) (recognizing that "an

15

standing. *See Conolly v. Taylor*, 27 U.S. (2 Pet.) 556, 565 (1829) (Marshall, C.J.) ("Where there is no change of party, a jurisdiction *depending on the condition of the party* is governed by that condition, as it was at the commencement of the suit." (emphasis added)).[11]  Rather, an amended complaint provides additional information that can be used to evaluate standing as of the date that the lawsuit was filed. *See Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824) (Marshall, C.J.) (explaining that subject-matter jurisdiction "depends upon the state of things at the time of the action brought").[12]  That is so because an amended complaint revises the prior pleading only to reflect a more accurate understanding of the state of things when the action was filed – not to update the pleading with later occurring facts.  But, if a district court permits a supplemental complaint,[13] then for the claims and requested

amended complaint 'supersedes the pleading it modifies'" (quoting 6 *Federal Practice and Procedure* § 1476)).

[11] *See also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) ("The state of things and the originally alleged state of things are not synonymous; demonstration that the original allegations were false will defeat jurisdiction.  So also will the withdrawal of those allegations, unless they are replaced by others that establish jurisdiction." (citations omitted)); *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 574–75 (2004) (holding that a party's post-filing change in citizenship cannot cure a lack of diversity jurisdiction from the lawsuit's outset).

[12] *Cf.* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."); *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 36 (3d Cir. 2018) (remanding for the potential cure of a jurisdictional defect through amendment).

[13] The standards for amendment and supplementation are similar, but they do not conform exactly as more lenience is afforded to amendment.  *Compare* Fed. R. Civ. P. 15(a)

relief substantively affected by the alleged post-suit developments,[14] a plaintiff's Article III standing is evaluated as of the date of the supplemental pleading. *See, e.g.*, *Greenberg v. Lehocky*, 81 F.4th 376, 384 n.4 (3d Cir. 2023) (evaluating a plaintiff's standing – and not mootness – based on a later-filed complaint that challenged a revision to a rule that occurred after the original complaint); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1347–52 (11th Cir. 2009) (evaluating plaintiffs' Article III standing based on a subsequent complaint challenging a revised statute).[15]

Here, Lutter labeled her second complaint as an 'amended complaint,' but that is not entirely precise: that pleading amended *and* supplemented the original complaint. It added the date that she submitted a dues deduction authorization card, June 30, 2011. It also dropped another union as a party. Those revisions reflect the state of things as of her original complaint, and thus they are amendments. But Lutter's second complaint removed the original allegation that Lutter "is a member of the JNESO." *Compare* Compl. ¶ 19 (JA44), *with* Am. Compl. ¶¶ 21–25 (JA56–57). It also added factual allegations that arose after the original complaint: that Lutter did not have any

---

(amendment "once as a matter of course" within a certain period and afterwards leave to amend should be "freely give[n] . . . when justice so requires"), *with id.* 15(d) (supplementation "on just terms"). *But cf. T Mobile Ne. LLC*, 913 F.3d at 327–29 (applying relation-back principles from amended pleadings to supplemental pleadings).

[14] *See Mathews v. Diaz*, 426 U.S. 67, 75 (1976) (recognizing that a supplemental complaint supersedes the prior complaint with respect to the allegations it supplements).

[15] Supplementation may not affect every claim and every form of requested relief. A supplemental pleading allows the reassessment of a plaintiff's Article III standing only for the claims and relief substantively affected by the supplementation.

17

opportunity to cease paying dues for nearly a year and that such dues were deducted from her paycheck during that time. Because those alterations reflect post-filing developments, they supplement the original complaint. Accordingly, Lutter's second complaint, although labeled as an 'amended complaint,' is actually an amended and supplemental complaint.

Critically for purposes of Article III standing, the supplemental allegations substantively affect all of Lutter's claims and requested relief. She now proceeds as a non-member of a union who seeks relief for the prior deduction of union dues from her paycheck for nearly a year. Because the supplemented allegations substantively affect the entirety of her claims and relief sought, Lutter's Article III standing should be evaluated as of February 28, 2020, the date she filed the second complaint.

Using that date to evaluate her standing, Lutter has failed to plausibly allege standing except with respect to her claims against JNESO for a refund of her union dues.[16]

### 1. Injury-in-Fact

Lutter's claims satisfy the injury-in-fact requirement. An injury-in-fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (citing *Lujan*, 504 U.S. at 560). Her operative complaint

---

[16] By plausibly alleging standing for one claim, Lutter also has standing for her requests for attorney's fees and costs, which, in this case, are dependent on the viability of her underlying claims. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) (recognizing that a request for attorney's fees under 42 U.S.C. § 1988 is "insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim" (citation omitted)).

sufficiently alleges the invasion of her First Amendment right against the compelled subsidization of speech. Lutter did not wish to financially support JNESO's speech, but as directed by the WDEA, union dues were deducted from her paycheck for ten months after she requested that they cease.[17] The invasion of that interest is actual since the funds were taken out of her paycheck against her wishes and used by JNESO. *See Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023) (recognizing a claim that one party kept money that it was not entitled to was "a classic pocketbook injury sufficient [for] standing"); *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) ("Monetary harm is a classic form of injury-in-fact." (citation omitted)); *see also Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 417 (3d Cir. 2013) (holding that an injury-in-fact exists by virtue of a defendant's "use of assets that belonged to" the plaintiff). Lutter's injury is particularized because the deduction of those union dues from her paycheck affected her "in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). And the deduction of union dues is concrete because it was "real, and not abstract." *Id.* at 340 (quotation marks and citation omitted).

---

[17] Because Lutter ties the deductions of her union dues to the WDEA, the nature of her injury-in-fact differs from the plaintiff in *LaSpina v. SEIU Pennsylvania State Council*, 985 F.3d 278 (3d Cir. 2021). There, a member of a public-sector union in Pennsylvania sued the union for continuing to collect dues for two months after she submitted a resignation, but unlike Lutter, the former union member did not allege that the union's delay was pursuant to the express direction from a state statute, such as the WDEA. *See id.* at 287 ("The deduction of membership dues without authorization in this context may be an injury. It is just not a constitutional one."); *cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 933 (1982) ("[P]rivate use of the challenged state procedures with the help of state officials constitutes state action for purposes of the Fourteenth Amendment.").

For completeness, and relevant for evaluating fairly traceable causation and redressability, which both depend on the nature of the injury-in-fact, *see TransUnion LLC*, 141 S. Ct. at 2203, Lutter does not plausibly allege an *imminent* injury-in-fact. At the time of her second complaint, Lutter was no longer a member of JNESO, so neither her inability to immediately resign from a union nor the deduction of future JNESO union dues from her paycheck was "certainly impending" or subject to a "substantial risk" of reoccurring. *Clapper*, 568 U.S. at 409, 414 n.5 (quoting *Lujan*, 504 U.S. at 565 n.2); *see also Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("A threatened injury must be certainly impending to constitute [an] injury in fact." (quotations and citation omitted)). Thus, Lutter alleges standing only for an *actual* injury-in-fact.

## 2. *Fairly Traceable Causation*

Lutter's operative complaint plausibly alleges a fairly traceable causal connection between her injury-in-fact and two of the defendants, but not the others. Fair traceability requires a causal connection between the injury-in-fact and a defendant's conduct; the injury cannot result from "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Here, Lutter's operative complaint alleges that JNESO and Essex County were responsible for the deductions of union dues from her paycheck, so her injury-in-fact is fairly traceable to their actions.

By contrast, Lutter's claims against the other defendants – all of whom are New Jersey officials sued in their official capacities – fail to allege fairly traceable causation. Because the WDEA prolonged the deductions of union dues from her paycheck, she sues the Governor, the Attorney General, and the Members of the Public Employment Relations Commission for declaratory and injunctive relief. Although Lutter alleges a causal nexus to the WDEA, she does not identify any action

20

taken by these state officials to enforce that statute; she alleges that only Essex County and JNESO were responsible for the dues deductions. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982) ("While private misuse of a state statute does not describe conduct that can be attributed to the State, the procedural scheme created by the statute obviously is the product of state action."). And without identifying a fairly traceable nexus between her injury-in-fact and conduct by the New Jersey officials, Lutter's allegations fail the second prong of Article III standing with respect to them.[18]

### 3. Redressability

The redressability requirement ensures that the asserted injury-in-fact is capable of resolution in a manner consistent with the traditional understanding of the judicial process. *See United States v. Texas*, 143 S. Ct. 1964, 1970 (2023); *Raines v. Byrd*, 521 U.S. 811, 819 (1997). For requested relief to satisfy this requirement, it "must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43). With respect to claims for legal or equitable relief, a favorable opinion need not relieve every injury; the judgment need only relieve "a discrete injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). However, for a declaratory judgment to provide redress, it must "completely resolve[] a concrete controversy susceptible to conclusive judicial determination." *Calderon v. Ashmus*, 523 U.S. 740, 749 (1998); *see also Coffman v. Breeze Corps.*, 323 U.S. 316, 323–24 (1945) (holding that a plaintiff lacked standing for a

---

[18] It is permissible to challenge the constitutionality of a state statute without suing state officials in their official capacities: both a federal statute and a federal rule of civil procedure expressly contemplate such a situation. *See* 28 U.S.C. § 2403(b); Fed. R. Civ. P. 5.1(a).

requested declaratory judgment on potential defenses to a claim that could be later adjudicated).

Applying these principles, Lutter's claim for compensatory damages against JNESO is redressable. Damages, which operate as a "*substitute* for a suffered loss," are a recognized form of judicial redress for past injuries. *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988) (citing D. Dobbs, *Handbook on the Law of Remedies* 135 (1973)); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) (holding that even nominal damages provide redress for a past injury-in-fact).

The other forms of relief that Lutter requests will not redress her injury-in-fact. She seeks a preventive injunction against JNESO and Essex County to enjoin the further collection of union dues from her paycheck. *See* Dobbs & Roberts, *Law of Remedies: Damages, Equity, Restitution* § 2.9(1) (3d ed. 2018) ("A preventive injunction attempts to prevent the loss of an entitlement in the future"). But by the time of her operative complaint, Lutter was not a member of JNESO, and Essex County was not deducting union dues from her paycheck. Because those deductions had already occurred and were not likely to reoccur – at least without Lutter's consent – a preventive injunction was unlikely to remedy the compelled past deductions of union dues from her paycheck. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974))).

Lutter's requests for declaratory judgments also fail the redressability requirement. She seeks declarations that the WDEA is unconstitutional and that she has a constitutional right to immediately resign from public-sector unions. But for a declaratory judgment to redress an injury-in-fact, as opposed to serving as an advisory opinion, it must provide something

22

other than the "emotional satisfaction" of a favorable ruling. *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977); *see also Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet [Article] III's requirements."). Instead, to redress an injury-in-fact, a declaratory judgment must provide conclusive resolution of a concrete controversy related to a prospective course of action by one of the adverse parties. *See Calderon*, 523 U.S. at 749 (holding that a declaratory judgment was not justiciable because it "would not completely resolve [all] challenges but would simply carve out one issue in the dispute for separate adjudication"); *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240–41 (1937) (holding that a request for a declaratory judgment regarding an insured's disability was justiciable). Yet Lutter does not identify any prospective course of action of her own or by JNESO or Essex County for which she needs legal resolution through declaratory judgments. *See Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 958 (10th Cir. 2021) (holding that a former-union-member plaintiff lacks standing for "a declaration [of the] constitutionality of the Union's opt-out window as applied to him"). If anything, Lutter's operative complaint, by alleging that she has resigned her JNESO membership and that the payroll deductions of union dues had ceased, confirms that resolution of either the constitutionality of the WDEA or her putative constitutional right to immediately resign from a public-sector union would have nothing more than an abstract value to her.

In short, based on her supplemental allegations, Lutter's operative complaint plausibly alleges Article III standing for only her damages claim against JNESO (as well as for her ancillary request for attorney's fees and costs from JNESO).

## B. Article III Mootness

Like standing, Article III mootness derives from the case-or-controversy requirement. *See Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3 (1964) ("Our lack of jurisdiction to review moot

23

cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy."); *cf. The Mootness Doctrine in the Supreme Court*, 88 Harv. L. Rev. 373, 374 (1974) (recognizing that initially courts grounded mootness "in the common law doctrine that courts lack power to decide abstract questions in cases where no dispute exists"). Accordingly, much of the mootness analysis parallels the tripartite standing test in that a prerequisite for mootness is the loss of standing during the pendency of the litigation. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998) ("[T]hroughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990))); *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975))). And just as the party seeking to establish standing bears the burden of proof, the party seeking to demonstrate the loss of standing during the pendency of the litigation bears the burdens of production and persuasion. *See Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305–06 (3d Cir. 2020). Also, mootness, like standing, may be raised at any time, but unlike standing, mootness depends on the state of things after the lawsuit commenced. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (permitting a mootness challenge based on events that occurred while the case was on appeal); *The Mootness Doctrine in the Supreme Court*, 88 Harv. L. Rev. at 377–78 ("In mootness inquiries . . . the range of factual questions which must be considered is greater than in other justiciability cases.").

Despite its similarities to standing, mootness is not merely the post-suit absence of standing. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190

(2000) ("Careful reflection on the long-recognized exceptions to mootness, however, reveals that the description of mootness as 'standing set in a time frame' is not comprehensive."); *Hartnett*, 963 F.3d at 306. The other case-or-controversy considerations – the genuine-adversity requirement and the prohibition on advisory opinions – also influence the mootness analysis. For instance, if a defendant ceases conduct that resulted in an actual or imminent injury-in-fact, the parties may remain genuine adversaries if the defendant, upon dismissal of the case, were "free to return to his old ways." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953).[19] Thus, a defendant's voluntary cessation of the complained-of conduct does not moot claims for prospective relief unless that defendant meets the "heavy" burden of establishing that "there is no reasonable expectation that the wrong will be repeated," *id.* at 633 (quotation omitted), and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citations omitted).[20] Similarly, if during the litigation, a plaintiff can no longer satisfy the elements of

---

[19] *See also Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."); *cf. City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001) (refraining from applying the voluntary cessation doctrine when it was the plaintiff, "not its *adversary*, whose conduct sap[ped] the controversy of vitality" (emphasis added)).

[20] *See also Friends of the Earth*, 528 U.S. at 189 ("The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." (alteration in original) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968))); *Hartnett*, 963 F.3d at 305–06.

standing, a court ruling may not be an advisory opinion if the plaintiff establishes that the defendant's conduct was capable of repetition yet evading review. *See County of Butler v. Governor of Pa.*, 8 F.4th 226, 231 (3d Cir. 2021) ("A plaintiff bears the burden to show that the 'capable of repetition yet evading review' exception applies." (citations omitted)); *N.J. Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 33 (3d Cir. 1985). In sum, the absence of Article III standing is a necessary condition for mootness, but due to the voluntary-cessation and capable-of-repetition-yet-evading-review exceptions, it is not always a sufficient condition.

In challenging mootness, JNESO bears the burden of establishing that Lutter lost Article III standing after the filing of her supplemental complaint on February 28, 2020. As far as its burden of production, JNESO relies on correspondence from its counsel to Lutter's attorney dated March 12, 2020. Enclosed therein was a check, which JNESO's counsel described in the cover letter as being in the amount of the union dues collected from Lutter "after she declared her desire to resign from membership in JNESO," plus interest. Letter from Ptasiewicz (JA85). There is, however, no evidence that Lutter ever cashed or deposited the check. Also, during the pendency of this appeal, New Jersey enacted the Responsible Collective Negotiations Act, which eliminated the ten-day window provided by the WDEA for public-sector employees to revoke their authorizations for payroll deductions of union dues. *See* 2021 N.J. Sess. Law Serv. Ch. 411 (West) (codified at N.J. Stat. Ann. § 52:14-15.9e). On that record, JNESO must – as a prerequisite to establishing mootness – demonstrate that Lutter's Article III standing was extinguished.

For the first and second elements of standing, those intervening events do not undo Lutter's injury-in-fact or its fair traceability to JNESO. Lutter's alleged injury-in-fact was the invasion of her First Amendment right protecting her from the compelled subsidization of speech through the operation of the WDEA, which, at the time, governed the deduction of union

26

dues from her paycheck. *See Janus*, 138 S. Ct. at 2464 ("When speech is compelled, . . . additional damage is done. In that situation, individuals are coerced into betraying their convictions."). But neither JNESO's check for Lutter's dues plus interest nor the repeal of the WDEA's ten-day window changed Lutter's allegations that she had subsidized JNESO's speech against her will. *See id.* ("Because the compelled subsidization of private speech seriously impinges on First Amendment rights, it cannot be casually allowed."). So her injury-in-fact persists, and it remains fairly traceable to JNESO, which received union dues from Lutter's paycheck after she requested that the deductions cease and that she resign from the union. *Cf. Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 81 (2013) (Kagan, J., dissenting) (explaining that after an unaccepted offer of judgment, the plaintiff's "stake in the lawsuit . . . remained what it had always been"); *see also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 162 (2016) (adopting Justice Kagan's analysis in her *Genesis Healthcare* dissent).

Like the other two elements, the third, redressability, is "rooted in the traditional understanding of a case or controversy." *Spokeo*, 578 U.S. at 338; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *Raines*, 521 U.S. at 818–19. Relevant here, the mechanism of contract has been traditionally understood to limit the scope of judicial redress. It is firmly entrenched in American jurisprudence that parties can contractually agree not to resolve disputes in court but proceed instead through arbitration. *See Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999) ("Arbitration is strictly a matter of contract."); *see also United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Once in court, parties may still alter their rights relative to one another by agreeing to resolve pending claims. Yet, from the founding, it has been understood that "courts 'render a judgment or decree

27

upon the rights of the litigant[s].'" *Texas*, 143 S. Ct. at 1980 (Gorsuch, J., concurring) (alterations in original) (quoting *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838)). So when parties alter their rights relative to one another through a settlement agreement, they typically eliminate the necessity of judicial redress with respect to the settled matters. *See Alvarez v. Smith*, 558 U.S. 87, 94 (2009) (recognizing that "where mootness results from settlement rather than happenstance, the losing party has voluntarily forfeited his legal remedy" (quotations and citations omitted)). *But cf. Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 224 (3d Cir. 2000) (holding that a case subject to a "high-low settlement agreement" was not moot). And by settling a dispute, the parties dramatically diminish the likelihood that a favorable decision would redress the injury-in-fact.[21]

But here there was no settlement contract to alter the parties' rights relative to each other and affect the scope of traditionally permissible judicial relief. JNESO's correspondence is not a valid settlement offer. In its cover letter, JNESO sought no promise or performance in return for the check. *See* Restatement (Second) of Contracts § 24 (Am. L. Inst. 1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."); *id.* § 3 ("A bargain is an agreement to exchange

---

[21] The mootness-by-reason-of-settlement principle makes unnecessary consideration of the voluntary-cessation and the capable-of-repetition-yet-evading-review exceptions. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29 (1994) (recognizing "mootness by reason of settlement" and discussing its consequences on a judgment under review); *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 400 (1977) (Powell, J., dissenting) ("The settlement of an individual claim typically moots any issues associated with it."); *Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir. 1992) ("Settlement of a plaintiff's claims moots an action").

*promises* or to exchange a promise for a *performance* or to exchange *performances*." (emphasis added)). To the contrary, JNESO disavowed "seeking any conditions or promises from Ms. Lutter." Letter from Ptasiewicz (JA85). Similarly, neither the cover letter nor the check contained conspicuous language that the check was tendered in full satisfaction of Lutter's claims – as required by New Jersey's Uniform Commercial Code for a check to function as a settlement offer. *See* N.J. Stat. Ann. § 12A:3-311(b) (West 2018) (allowing discharge of a claim "if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim"). Even if the check did suffice for a settlement offer, Lutter did not accept it because under New Jersey's Uniform Commercial Code, to accept such an offer, the recipient has to "obtain[] payment of the instrument," and there is no evidence that Lutter ever did so. *Id.* § 12A:3-311(a); *see also Hoekman v. Educ. Minn.*, 41 F.4th 969, 977 (8th Cir. 2022) ("[A]n uncashed check is not materially different from an unaccepted offer of settlement."). Yet, an unaccepted settlement offer – even one that purports to satisfy a claim in full – does not moot a case. *See Campbell-Ewald*, 577 U.S. at 162–63; *id.* at 174 (Thomas, J., concurring in the judgment) ("[S]tate and federal courts have not considered a mere offer, without more, sufficient to moot [a] case."); *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (holding that a post-certiorari offer to class members to fully refund the collection of disputed union dues did not moot the case); *LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 288 n.2 (3d Cir. 2021) (suggesting in *dicta* that a former union member's "refusal to cash the check may be sufficient to defeat mootness").[22] Thus,

---

[22] *See also Genesis Healthcare*, 569 U.S. at 81 (Kagan, J., dissenting) (recognizing that an unaccepted offer of judgment does not limit "the court's capacity to grant . . . relief"); *Gates v. Towery*, 430 F.3d 429, 432 (7th Cir. 2005) ("A defendant

JNESO's correspondence to Lutter, inclusive of the check for union dues plus interest, does not, by itself, moot her case.

Still, a settlement agreement is not necessary to moot a case. *See Campbell-Ewald*, 577 U.S. at 180 (Roberts, C.J., dissenting) ("Article III does not require the parties to affirmatively agree on a settlement before a case becomes moot."). The unilateral action of one party may eliminate a plaintiff's Article III standing, but that commonly occurs when some unilateral action abates the asserted injury-in-fact, especially for injuries that are ongoing or imminent. *See Burke v. Barnes*, 479 U.S. 361, 364 n* (1987) (concluding that the expiration of a statute extinguished any "judicially cognizable injury"); *cf. Lewis*, 494 U.S. at 481 (permitting "suits for prospective relief to go forward despite abatement of the underlying injury only in the 'exceptional situations'" of an injury capable of repetition yet evading review (quoting *Lyons*, 461 U.S. at 109)); *DeFunis v. Odegaard*, 416 U.S. 312, 318 (1974) (recognizing the usual applicability of voluntary cessation concerns in response to a defendant's "unilateral change" that eliminates the claimed injury).

But this case involves an *actual* injury-in-fact inflicted in the past that remains. So to show that Lutter's claim is presently non-redressable, JNESO must demonstrate that even without a settlement agreement to alter the rights of the parties, a damages award would be unlikely to redress Lutter's injury. JNESO identifies one case fitting that description: *California v. San Pablo & Tulare R.R. Co.*, 149 U.S. 308 (1893). There, a railroad that owed delinquent taxes to California deposited the amount of money owed in taxes plus interest, penalties, and costs, into a bank. Under a state statute, those actions "extinguished" the railroad's obligation for the payment of money. *Id.* at 314. Because a state statute allowed the

---

cannot simply assume that its legal position is sound and have the case dismissed because it has tendered everything it *admits* is due.").

unilateral action by one party to alter the parties' rights relative to each other and affect the scope of traditionally permissible judicial relief, the Supreme Court held that the case was moot. *Id.* But here, there is no applicable law that, when coupled with JNESO's post-filing actions, would alter the rights of the parties relative to one another.

Altogether, in the absence of a settlement agreement or some other alteration of the litigants' relative rights, JNESO has not demonstrated that the traditional damages remedy would not likely provide some redress to Lutter. *See* 13C *Federal Practice and Procedure* § 3533.3 ("The availability of damages or other monetary relief almost always avoids mootness."). And without proof that Lutter lost Article III standing during the litigation, this case is not moot. *See Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am., AFL-CIO-CLC*, 791 F.2d 1074, 1080 (3d Cir. 1986) (recognizing that one party's "motivating interest in securing a precedent does not render the case nonjusticiable as long as there are, in fact, stakes at issue").[23]

This holding – that the post-suit provision of a check for the amount owed for the underlying claims plus interest does not moot Lutter's claims – aligns well with the fee-shifting consequences of dismissals on mootness grounds. Even when a statute authorizes the recovery of attorney's fees, a plaintiff cannot recover fees for a mooted claim because such a disposition lacks the "judicial imprimatur" of a change in the legal relationship of the parties. *Buckhannon Bd. & Care Home, Inc. v. W.V. Dep't of Health & Hum. Res.*, 532 U.S. 598, 605 (2001) (emphasis removed); *see also Lewis*, 494 U.S. at 480. Under that rule, a dismissal on mootness grounds is an attractive disposition for a defendant who is subject to liability

---

[23] Because the voluntary-cessation and capable-of-repetition-yet-evading-review exceptions apply only when a plaintiff has lost Article III standing during the course of the litigation, it is not necessary to address their applicability here.

for attorney's fees but who does not wish to contest liability for the underlying claims. In contrast to the other options commonly available to such a defendant for resolving the case expeditiously – settling it,[24] defaulting,[25] or making an offer of judgment[26] – which require an accounting for fee liability at some point, a dismissal on mootness grounds does not. So if a check in the amount owed for the underlying claims (but not fees and costs) sufficed for mootness, then defendants could avoid fee liability in an unprecedented manner. By avoiding that outcome, today's holding does not open a loophole for defendants to avoid fee exposure. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1538 (2020) (Alito, J., dissenting) ("But where a live controversy remains, a defendant who would otherwise be liable for attorney's fees should not be able to wiggle out on the basis of a spurious claim of mootness.").[27]

---

[24] *See Buckhannon*, 532 U.S. at 609 ("If a case is not found to be moot, and the plaintiff later procures an enforceable judgment, the court may of course award attorney's fees. Given this possibility, a defendant has a strong incentive to enter a settlement agreement, where it can negotiate attorney's fees and costs.").

[25] *See* Fed. R. Civ. P. 55.

[26] *See* Fed. R. Civ. P. 68(a), (d); *see also* 42 U.S.C. § 1988(b) (defining attorney's fees as part of "costs"); *Marek v. Chesney*, 473 U.S. 1, 46 (1985) (Brennan, J., dissenting, app.) (recognizing 42 U.S.C. § 1988 as a statute in which attorney's fees were referred to as 'costs').

[27] Because it dismissed Lutter's complaint on standing and mootness grounds, the District Court did not consider JNESO's two additional challenges to the legal sufficiency of the operative complaint. But with the partial vacating of the District Court's order to allow Lutter's damages claim against JNESO, those two issues – whether *Janus* invalidated

**CONCLUSION**

For the foregoing reasons, the orders of the District Court will be affirmed in part and vacated in part, and this case will be remanded for resolution of Lutter's claims for damages (and potentially attorney's fees and costs) against JNESO.

---

previous, valid authorizations of payroll deductions of union dues and whether JNESO was a state actor subject to suit under § 1983 – are properly addressed in the first instance by the District Court on remand. Also, because Lutter lacks standing to pursue claims against the official-capacity defendants, it is not necessary to resolve their arguments in favor of Eleventh Amendment immunity and certification to the New Jersey Supreme Court.